### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF LOUISIANA, EAST BATON ROUGE PARISH

| | | |
|---|---|---|
| **WILLIAM M. ARMSTRONG,** | * | **CASE NO.** |
| | * | |
| **VERSUS** | * | **COMPLAINT** |
| | * | |
| **BOARD OF SUPERVISORS OF** | * | |
| **LOUISIANA STATE UNIVERSITY** | * | |
| **AND AGRICULTURAL AND** | * | |
| **MECHANICAL COLLEGE.** | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

Plaintiff William M. Armstrong ("Mr. Armstrong"), by and through his attorneys, Michael Mann Thompson and Lisa A. Cahill, as and for his complaint against the above-named defendant, respectfully alleges as follows:

### INTRODUCTION

1.     Mr. Armstrong brings this action against the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU" or "the University") based on breaches of an employment contract between the parties dated July 1, 2020 ("the Contract"). Specifically, the University explicitly based its June 2022 "for cause" termination of Mr. Armstrong, its former Associate Head Coach of the Men's Basketball Program, on National Collegiate Athletic Association ("NCAA") rules violation allegations alone, which are not a cognizable "for cause" basis for termination under the Contract, rendering the termination wrongful.   Even assuming, *arguendo*, that the University's termination was lawful, the University denied Mr. Armstrong two months compensation to which he was entitled under the Contract and for which he has made demand, which entitles Mr. Armstrong to breach damages, as well as unpaid wages, penalty wages and attorney's fees under the Louisiana Wage Payment Act.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over this action pursuant to 28

U.S.C. § 1332 insofar as the matter in controversy exceeds the sum or value of $75,000,

exclusive of interest and costs, and is between citizens of different states.

3.      The events giving rise to this lawsuit occurred in the City of Baton Rouge,

Louisiana, Parish of East Baton Rouge, which sits in this District.   Venue is proper in this

District pursuant to 28 U.S.C. § 1391 because Mr. Armstrong's claims arose in the District.

Moreover, the Contract between the parties provides that "[a]ny civil action to enforce this

Agreement shall be brought in a state or federal court having jurisdiction and domiciled in East

Baton Rouge Parish, Louisiana."

## JURY DEMAND

4.      Mr. Armstrong hereby demands trial by jury of all issues raised in this complaint.

## PARTIES

5.      Mr. Armstrong, 45 years of age, is a citizen of Missouri.  He has spent the whole

of his professional career in college men's basketball coaching, primarily at NCAA Division I

schools.   He began his career in 2001 as a Graduate Assistant Coach at his alma mater,

University of Alabama at Birmingham, and steadily worked his way through the coaching ranks

until, in 2020, he was promoted to Associate Head Coach at LSU.

6.      LSU is a member of the powerful Southeastern Conference ("SEC"), whose teams

have won a combined 11 NCAA men's basketball championships.   LSU has itself earned 24

NCAA men's basketball tournament berths.   Five teams coached by Mr. Armstrong over his

career, including LSU, have earned coveted bids to the annual NCAA tournament and numerous

players Mr. Armstrong coached have gone on to play in the National Basketball Association.

7.      The next logical step in Mr. Armstrong's career, given his trajectory, would have

been obtaining a prestigious and lucrative head coach position at an NCAA Division I level

institution.

8.      Mr. Armstrong's lengthy career was unblemished by any regulatory action.  In

over 20 years of coaching, the NCAA never once found Mr. Armstrong in violation of any rule

or regulation.  ████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

9.      In June 2022, Mr. Armstrong was hired by Link Academy, a private high school

in Branson, Missouri, to be the head coach of its boys basketball team at an annual salary of

$75,000.   He began coaching the team in the Fall of 2022.

10.     Defendant Board of Supervisors of Louisiana State University and Agricultural

and Mechanical College was at all relevant times and continues to be the governing body of the

Louisiana State University system, which includes LSU, a public state university located in

Baton Rouge, Louisiana, Parish of East Baton Rouge, with its principal place of business at 3810

W. Lakeshore Drive, Baton Rouge, Louisiana, 70808.

## FACTS

A. The Contract

11.     In 2020, the University promoted Mr. Armstrong from Assistant Coach to Associate Head Coach.  This elevation made him the second most senior member of the coaching staff, behind Head Coach Will Wade ("Wade").

12.     The parties executed the Contract on July 1, 2020, coincident with Mr. Armstrong's promotion.  The Contract term was from July 1, 2020 through June 30, 2022 and provided for, among other compensation elements, an annual salary of $375,000, an $800 monthly automobile allowance, and post-season incentive compensation, *e.g.*, 4% of that salary if a team Mr. Armstrong coached qualified for the NCAA Division I national tournament and he actively coached the team for the first game the team played.  The Contract provided additional elements of post-season incentive compensation if the team advanced in the tournament.

13.     Of relevance to this action, the Contract defined "Governing Athletics Regulations" as "(1) all applicable federal and state laws governing intercollegiate athletics; and (2) all governing constitutions, by-laws, rules, policies, interpretations, and regulations of the [NCAA], the Southeastern Conference ('SEC'), LSU and any other conference or Agreement."

14.     The Contract contained a subsection addressing any LSU termination of Mr. Armstrong "for Cause."   In pertinent part, the Contract provided that bases for a "cause" termination included the following:

> a.    "Commission of a material and substantial violation . . . of Governing Athletics Regulations, or failing promptly to report any such violation by another person to the President and the Senior Associate Athletic Director for Compliance, or committing a material and substantial violation of any LSU policies, rules, or procedures that are within the scope and/or meet the definition of Governing Athletics Regulations" (Contract, § 11(A)(1)(a));

b.  "Commission of a material and substantial violation of Governing Athletics Regulations involving any aspect of the Program [defined elsewhere as the 'intercollegiate Men's Basketball program at LSU'] by any other person if either:  (i) the violation occurs or continues to occur after [Mr. Armstrong] knew or had constructive knowledge that it was about to occur or was occurring, or (ii) [Mr. Armstrong] failed to establish and maintain reasonable policies and procedures established in writing by the Athletic Department for the Program to prevent violations of Governing Athletics Regulations from occurring and to detect promptly any such violations which may occur" (Contract, § 11(A)(1)(b));

c.  "Engaging in serious misconduct which either: (i) displays a continual, serious disrespect or continual, serious disregard for the mission of LSU;  (ii) brings [Mr. Armstrong] into substantial public disrepute sufficient to materially impair [his] ability to perform the obligations contained herein without material adverse impact on the Team or Program;  or (iii) constitutes moral turpitude or breaches the high moral and ethical standards applicable to [Mr. Armstrong] as a visible representative of LSU, including but not limited to, acts of dishonesty, misrepresentation, fraud, or violence that may or may not rise to [the] level of warranting criminal prosecution by the relevant authorities" (Contract, § 11(A)(1)(d)); and

d.  "Failing to report promptly to the Senior Associate Athletic Director for Compliance any violations of Governing Athletics Regulations involving the Team of which [Mr. Armstrong] has actual knowledge" (Contract, § 11(A)(1)(p)).

15.    Thus, each of these pertinent "for cause" provisions had one of the following prerequisites, according to the plain language of the Contract: (a) the actual commission of a material and substantial violation of "Governing Athletics Regulations" by Mr. Armstrong or another individual; or (b) the actual commission by someone other than Mr. Armstrong of a violation of Governing Athletics Regulations; or (c) Mr. Armstrong engaging in serious misconduct.

16.    The Contract did not include as a basis for a "for cause" termination *alleged* violations of Governing Athletics Regulations or *alleged* misconduct.   This distinguished Mr. Armstrong's contract from a renegotiated contract Head Coach Wade entered into with the

University in April 2019 at a time when he had been suspended and, upon information and belief, his case for continued employment was tenuous.   As part of those renegotiations, Wade agreed that any future NCAA issuance of *allegations* of a Level I or II violation would constitute "cause" for his termination.  His renegotiated contract included the following language:

> If the NCAA Committee on Infractions issues a formal notice of allegations of a Level 1 [sic] or Level 2 [sic] violation to LSU, involving COACH, LSU shall have cause to terminate COACH's employment, whether such claims are pursuant to the Agreement or otherwise.   In that event, COACH hereby agrees to waive any and all claims that LSU terminated him or terminated him without cause, whether such claim is based on the Employment Agreement or otherwise.

17.    The Wade contract renegotiations followed Wade's five-week suspension by the University in the wake of publication of an article from Yahoo on March 7, 2019.  That article reported that a federal wiretap allegedly captured Wade describing arrangements he had made to lure a recruit with illicit payments.  Upon information and belief, Wade denied wrongdoing and the University had no proof to corroborate the Yahoo story.

18.    In a telephone interview with the New York Times on March 18, 2022, the President of the University at the time of the Wade contract renegotiations, F. King Alexander, was quoted as stating the following:  "If we had fired Will Wade because of what was leaked to Yahoo, then we'd pay him" the remaining $10 million or more on his contract.  "And if nothing comes out, he can sue us for ruining his career. . . . Presidents have to follow due process rights." N.Y. Times, *L.S.U.'s Mess of a Season Ends Amid Coach's Firing* (Mar. 19, 2022).

16.    Section 11(A)(3) of the Armstrong Contract provided further that "[a]ny judgment as to whether the criteria contained in this Section [covering 'for cause' termination] have been met shall not be made arbitrarily or capriciously by LSU."  That provision constituted a "procedure established in this Agreement" for purposes of Section 11(F)'s waiver of consequential damages clause.

17.     Section 11(A)(3) of the Contract spelled out other relevant procedures that would govern any termination of Mr. Armstrong for cause.  For example, prior to any termination for cause, the University agreed to provide Mr. Armstrong with "written notice of contemplated termination and a statement of the grounds and facts in support thereof" and that Mr. Armstrong would have five calendar days from receipt of such notice to respond in writing and/or present documents or other written evidence to the Athletic Director.  Following any such response, the Contract provided that the Athletic Director or his designee would give Mr. Armstrong written notice of a decision, which would be final absent a request for a hearing to the University President.

18.     The Contract therefore drew a distinction between a "written notice of contemplated termination" and "written notice of a [termination] decision."

19.     The Contract provided that in the event of termination for cause, Mr. Armstrong's base salary amount, any supplemental compensation due him, and all other compensation and benefits provided for in the Contract "shall terminate on the termination date . . . "  LSU would be liable for any sums earned prior to the termination date.  "Termination date" was defined as "the date on which the initial notice of termination is given, or on such later date as may be set forth by LSU in the notice of termination."

20.     The Contract contained a waiver of consequential damages clause, which would apply "in any instance of termination for cause . . . effected in accordance with the procedures established in this Agreement . . . "

B. <u>NCAA Notice of Allegations</u>

21.    The NCAA governs athletic competition among higher education institutions across three divisions, and enforces a detailed set of rules, regulations and bylaws affecting the full spectrum of college athletics operations.

22.    Upon information and belief, the NCAA Enforcement Staff commenced in 2018 separate investigations into possible rules violations involving the LSU football and men's basketball programs.   As reflected on the NCAA's public website, both investigations were subsequently consolidated before the IARP and referred to the CCU in turn.   *See* https://iarpcc.org/referred-cases/louisiana-state-university/.

23.    In October and December 2020, LSU announced publicly that it was self-imposing penalties on itself for what it acknowledged were possible NCAA Level I violations involving the football program.  Level I violations are the most serious on the NCAA ladder of infractions.  The self-imposed penalties included a one-year post-season ban on football for the 2020-21 bowl season, surrender of eight football scholarships over two years and other reductions in recruiting activity.

24.    Upon information and belief, LSU did so to head off arguably the most serious alleged Level I violation the NCAA could level against a university – failure to exercise institutional control – or, failing that, to position itself favorably for a negotiated resolution or to mitigate any penalties the NCAA might ultimately impose on it.   NCAA Division I Bylaws specifically provide that a hearing panel may consider mitigating circumstances in prescribing an appropriate penalty for any violation, including an institution's "imposition of meaningful corrective measures and/or penalties" (Bylaw 19.9.4(b)).

25.    Among penalties an NCAA hearing panel could potentially impose in the face of a proven Level I violation are a prohibition against competition with other NCAA members, a post-season competition ban, or a term of probation.

26.    LSU's football team has historically been the single largest revenue driver in its Athletic Department, generating millions of dollars in net revenue annually.  Any NCAA penalty that would impair the football program's ability to compete would therefore have serious economic consequences for the University's Athletic Department.

27.    On March 7, 2022, the CCU's investigation of the LSU football and basketball programs culminated in its issuance to LSU's President of a formal "Notice of Allegations" ("NOA").  *See* https://iarpcc.org/referred-cases/louisiana-state-university/.  LSU published a modestly redacted version of the NOA on or about March 12, 2022, obscuring student-athlete names (*publicly available at*

https://bloximages.newyork1.vip.townnews.com/theadvocate.com/content/tncms/assets/v3/editorial/c/8b/c8b013b4-a256-11ec-b696-4374ec1cbd2a/622d23f76cdcd.pdf.pdf).

28.    According to what LSU released publicly, the NOA contained 11 alleged violations of NCAA regulations relating to the University football and men's basketball programs, including a Level I violation leveled against the University for failure "to exercise institutional control and monitor the conduct and administration of its football and men's basketball programs."   Ten of the 11 allegations were classified as Level I ("severe breach of conduct") or Level II ("significant breach of conduct") violations.  Three of the allegations (including a less serious Level III ("breach of conduct") violation) related to the University football program;  eight related to the men's basketball program, including alleged violations by Wade and Mr. Armstrong.

29.     According to what LSU released publicly, Mr. Armstrong was named in two of the allegations.   One, a charged Level 1 violation, alleged that in the time period February to June 2020, he offered impermissible recruiting inducements to a high school athlete who ultimately did not enroll at LSU.   The second, a less serious charged Level II violation, alleged that Mr. Armstrong improperly prearranged and initiated a luncheon encounter with the family of a recruit on the day of the recruit's high school game.   The NCAA did not allege that that encounter involved any inappropriate recruitment discussion.

30.     ███████████████████████████████████████████████ ██████████████████████   The purpose of the hearing, according to NCAA Bylaw 19.11.5.7, is for the "hearing panel . . . to make factual findings and conclude whether violations of NCAA bylaws occurred . . . . "   NCAA Bylaws entrust the panel with imposing penalties should it find any violations proven.

31.     According to what LSU released publicly, the NOA reflected as a potential mitigating factor the IRP hearing panel might consider that Mr. Armstrong "has no prior conclusions of Level I, Level II or major violations during his approximate 15 years as part of NCAA coaching staffs."

32.     According to what LSU released publicly, the NOA also cited as a potential mitigating factor the IRP hearing panel might consider in assessing any penalty against the University that the "institution reacted quickly to the discovery of the football violations, accepted responsibility and implemented penalties that included disassociating from the representatives of its athletic interests."

33.     ███████████████████████████████████████████████ ██████████████████████████████████████████████

████████████████████████████████████████████████████ As observed in a January 2022 arbitration decision in *Ollie v. The Board of Trustees of the University of Connecticut*, "NCAA proceedings bear little relationship to an impartial adjudicatory process. The enforcement staff does not take witness testimony under oath and witnesses are not subject to cross-examination." ████████████████████████████████████

34.     Under NCAA rules governing the IARP, Mr. Armstrong, LSU and Will Wade are entitled to investigate the allegations, to respond to them, and to defend themselves at the ████████████████ hearing.

35.     The NCAA Division I Manual provides that at any point before a hearing, the NCAA "may negotiate a resolution" with any party "about alleged violations and proposed penalties" (Bylaw 19.5.12).

36.     The NCAA Division I Manual also provides that its hearing panels may consider the following mitigating factors in prescribing appropriate penalties where an institution has been found, following a hearing, to have committed a violation:  (a) an institution's "imposition of meaningful corrective measures and/or penalties" (19.9.4(b)); and (b) "exemplary cooperation" (19.2.3.1).  Indeed, as noted above, the NOA specifically pointed to Bylaw 19.9.4(b) and the University's earlier "disassociation" from certain football representatives as a potential mitigating factor that hearing members might consider at the February 2023 hearing.

C.   The Termination

37.     On March 12, 2022, five days after the NCAA's release of the NOA ████████████████████████████████████████████████████████████████████, LSU provided Mr. Armstrong written notice of its "intent to terminate" the Contract for cause ("Notice of Intent").  The Notice of Intent reminded Mr. Armstrong that pursuant to the Contract,

he had five calendar days to provide a written response to the Notice.  Section 11(A)(3) of the Contract states that "[p]rior to termination for cause, EMPLOYEE shall be provided with written notice of contemplated termination and a statement of the grounds and facts in support thereof and shall have five calendar days from receipt of such notice to respond in writing and/or present documents or other written evidence to the Athletic Director."

38.    The Notice of Intent stated that "[t]he grounds for termination are found in Section B(6) and B(8) of the [NCAA's] March 7, 2022 Notice of Allegations [that is, the allegations of Level I and Level II violations referenced in paragraph 29 above] and are incorporated by reference. . . . LSU intends to terminate your employment pursuant to Sections 11(A)(1)(a), 11(A)(1)(b), 11(A)(1)(d) and 11(A)(1)(p) of the [Contract] [quoted in full at paragraph 14 above]."

39.    In a letter to the LSU Community made public on March 12, 2022, the same date the University delivered the Notice of Intent to Mr. Armstrong, LSU President William F. Tate, IV and Director of Athletics Scott Woodward addressed the decision to terminate the coaches. The letter explained that "[w]e can no longer subject our University, Department of Athletics, and – most importantly – our student-athletes, to this taxing and already-lengthy process without taking action.  Our responsibility to protect and promote the integrity and well-being of our entire institution and our student-athletes will always be paramount" (*available at* https://lsusports.net/news/2022/03/12/a-letter-from-president-william-f-tate-iv-and-director-of-athletics-scott-woodward/) ("Tate/Woodward Letter").

40.    Although the Tate/Woodward Letter did not expressly state that Mr. Armstrong's termination was *for cause*, that was implicit.   It stated that Wade, the head coach and Mr. Armstrong's immediate supervisor, *was* terminated for cause.   It opined that the "evidence"

collected by the NCAA "was as thorough and fair as possible," that the allegations were "serious" ones and that the University had "engage[d] in deliberate and thoughtful discussions" in advance of the termination decisions.   No reader of the letter could reasonably have understood Mr. Armstrong to have been terminated for anything but cause.   At least one industry publication covering the story reported that Mr. Armstrong had been fired for cause.

41.     Although NCAA Bylaws contain a confidentiality directive binding on member institutions pending a "final decision" in a matter, the University, as noted above, released a redacted version of the NOA simultaneous with publication of the Tate/Woodward Letter, excluding subject student-athletes' names.  According to the Tate/Woodward Letter, it did so "[a]s requested, as required by State law."   The University did not indicate whether it had received any formal public disclosure request, and did not release the purported "request." Upon information and belief, the University could have forestalled and/or challenged publication of the NOA, including through litigation or reliance on the NCAA Bylaws confidentiality provision, had it desired to do so.

42.     At the same time it wielded the NOA to justify terminating Wade and Mr. Armstrong on the eve of the NCAA tournament, which offered the potential of a capstone in their respective careers, the Tate/Woodward Letter self-servingly preserved the University's own ability to challenge the alleged Level I "failure to exercise institutional control" violation.   It stated that "our decision to terminate Coach Wade and Coach Armstrong is not an acknowledgement of agreement with any of the allegations."

43.     With the Tate/Woodward Letter, and knowing that Mr. Armstrong was hamstrung from responding by the NCAA Bylaws confidentiality requirement, the University seized the public narrative around the NOA – to wit, that the University was an upstanding public citizen

betrayed by rogue misconduct on the part of Wade and Mr. Armstrong.  The Tate/Woodward letter insinuated that the "cause" for termination involved matters so "serious" that Wade and Mr. Armstrong's continued employment would jeopardize "the integrity and well-being" of the University and its student-athletes.

44.     The University's selection of March 12, 2022 as the date to issue the Notice of Intent, the same day timing of the Tate/Woodward letter, the self-serving and prejudicial nature of that letter and release of the NOA had the result of inflicting maximum reputational damage on Mr. Armstrong.  March 12 was the date of the semifinals of the SEC tournament and the eve of NCAA "Selection Sunday," when the bracket for the national tournament is announced.   If the University was searching for the one temporal window when every sports reporter in the nation would be focused on Division I men's college basketball, it found it.  Various national sports publications reported on the termination decisions and the NOA, including ESPN, Sports Illustrated and The Athletic, as did the New York Times.

45.     Not surprisingly, having lost their two lead coaches and being thrust into a media firestorm, the LSU Men's Basketball team lost the first game of the NCAA tournament.

46.     In a New York Times article published a week following the terminations, F. King Alexander, Tate's predecessor as President, was quoted in the context of reflections on the earlier 2019 Wade contract renegotiations as stating that "[y]ou need evidence to ruin somebody's career."  N.Y. Times, *L.S.U.'s Mess of a Season Ends Amid Coach's Firing* (Mar. 19, 2022).

47.     On March 17, 2022, Mr. Armstrong's lawyers timely challenged the Notice of Intent in a ten-page, single-spaced letter.  That letter asserted that a termination on the basis of mere allegations was "inadequate" under any circumstances and particularly so in the case of the

NOA, ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ as well as LSU's own publicly stated refusal to accept the allegations as proven.  The letter urged the University to reclassify a future final termination decision as one "without cause," which would entitle Mr. Armstrong to be paid through the end of the contract term, or June 30, 2022, and would not doom his efforts to find alternative employment.  "This is not an expensive resolution," the letter stated, "but it is the fair and only legally appropriate one given what we have set forth above."

48.    Had the University reclassified the termination as one without cause – the only appropriate outcome based on the record – Mr. Armstrong conceivably could have secured employment at the Division I level.  But it did not do so, leaving him unemployable in the only professional community he has worked in for over 20 years.

49.    The University continued to pay Mr. Armstrong's monthly salary following delivery to him of the Notice of Intent, making payments at the end of March and April 2022 for those months respectively.   Mr. Armstrong did not receive a salary payment at the end of May, however.  His lawyer wrote the University on June 2, 2022, complaining that the University was in breach of the Contract and demanding that it "take immediate steps to rectify the breach."

50.    On June 3, 2022, LSU's Deputy General Counsel e-mailed Mr. Armstrong's lawyer a letter from LSU's Athletic Director, Scott Woodward, dated June 2, 2022.   The letter set forth the University's written termination decision, stating that "[a]fter careful review and consideration of your March 17, 2022 letter, I conclude that the grounds for termination for cause in the March 12, 2022 letter are sufficient."  Those "grounds for termination," to reiterate,

were explicitly stated in the March 12 letter as being the two <u>alleged</u> violations of NCAA regulations.

51.    Mr. Armstrong's termination date was June 3, 2022, the date the University rejected in writing his challenge to the March 12 Notice of Intent.  Pursuant to section 11(A)(2) of the Contract, and assuming *arguendo* that it had valid cause to terminate, the University was obligated to pay Mr. Armstrong any compensation earned prior to June 3, 2022, which would include, at a minimum, his salary for the month of May and the first two day of June and the corresponding automobile allowance.

52.    Although the University's March 12 and June 2, 2022 letters asserted that the "effective" date of the termination was March 12, 2022, that cannot be so given the plain language of the contract (including but not limited to section 11(A)(3), referring to a "written notice of contemplated termination" necessarily preceding "termination for cause"), the March 12 letter's self-description as "written notice of LSU's *intent* to terminate" (emphasis added), and the University's satisfaction of its contractual salary payment obligations to Mr. Armstrong for the months of March and April.

53.    Upon information and belief, the notice and "opportunity to respond" provisions of the Contract were drafted to comply with due process requirements for public institutions set forth in the United States Supreme Court's *Loudermill* decision.  Rendering the termination "effective" March 12, as LSU proposed in the March 12 and June 2, 2022 letters – the very same date Mr. Armstrong was given notice and the opportunity to respond – would nullify and render meaningless those due process provisions of the Contract.

54.    As noted above, Mr. Armstrong's lawyer wrote LSU on June 2, 2022 demanding that the breach of contract for non-payment of compensation due under the Contract for May

2022 be rectified.   On August 2, 2022, his lawyer reiterated to LSU the demand for compensation still owed to him under the Contract, specifically raising the prospect of penalty wages under the Louisiana Wage Payment Act.  As of this filing date, the University has not paid Mr. Armstrong the compensation owed to him under the Contract from May 1 through June 2, 2022.

**FIRST CAUSE OF ACTION**
<u>(Breach of Section 11 of the Contract)</u>

55.     The allegations in paragraphs 1 through 54 of the complaint are repeated and realleged as if fully set forth herein.

56.     Mr. Armstrong and LSU entered into a contract enforceable under Louisiana law.

57.     The Contract provided that LSU could terminate Mr. Armstrong "for cause." However, LSU has relied exclusively on alleged NCAA Level I and Level II violations against Mr. Armstrong in the NOA for its cause determination, asserting in the Notice of Intent that those allegations satisfy subsections (a), (b), (d) and (p) of the "Termination by LSU for Cause" section of the Contract.  In fact, those allegations do not and could not possibly establish, as the Contract requires, (i) the actual commission of a material and substantial violation of "Governing Athletics Regulations" by Mr. Armstrong or another individual (subsections (a) and (b));  or (ii) the actual commission of a violation of "Governing Athletics Regulations" by someone other than Mr. Armstrong (subsection (d)); or (iii) Mr. Armstrong engaging in serious misconduct (subsection (p)).

58.     ██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████  At present, ████████████████████████████████████

████████, the NOA consists of mere allegations and no fact finding.

59.    President Tate's immediate successor, F. King Alexander, stated in a March 2022 telephone interview with the New York Times that "[y]ou need evidence to ruin somebody's career."

60.    Subsections (a), (b), (d) and (p) of the "Termination by LSU for Cause" section of the Contract cannot be satisfied by mere allegations.

61.    Because the NOA contains no determinations sufficient to satisfy the "for cause" criteria in subsections (a), (b), (d) and (p) of section 11(A)(1) of the Contract, LSU's termination of Mr. Armstrong was without cause and a breach of the Contract.

## SECOND CAUSE OF ACTION
### (Breach of Section 11.A.2 of the Contract)

62.    The allegations in paragraphs 1 through 61 of the complaint are repeated and realleged as if fully set forth herein.

63.    Mr. Armstrong and LSU entered into a contract enforceable under Louisiana law.

64.    Pursuant to the Contract, Mr. Armstrong was entitled to his base salary amount and all other compensation and benefits provided for under the Contract up to his termination date.  The termination date was June 3, 2022.

65.     LSU's failure to pay Mr. Armstrong's salary and other benefits for the month of May and June 1 and 2, prior to the June 3, 2022 termination date, is in breach of its obligations to him under section 11.A.2 the Contract.

### THIRD CAUSE OF ACTION
(Violation of Louisiana Wage Payment Act, La. Rev. Stat. §§ 23:631, 632)

66.     The allegations in paragraphs 1 through 65 of the complaint are repeated and realleged as if fully set forth herein.

67.     For the two years leading up to June 3, 2022, LSU had been Mr. Armstrong's employer.   The parties' relationship was governed by an employment agreement enforceable under Louisiana law.

68.     On Mr. Armstrong's June 3, 2022 receipt of the Athletic Director's letter concluding that the grounds for termination for cause in the Letter of Intent were "sufficient," the employment relationship between LSU and Mr. Armstrong ceased to exist.

69.     June 3, 2022 was Mr. Armstrong's "termination date" pursuant to section 11.A.2 of the Contract.

70.     On the June 3, 2022 termination date, LSU owed wages to Mr. Armstrong pursuant to the Contract for the month of May and June 1 and 2, 2022.

71.     In a letter from his lawyer to the University on June 2, 2022, Mr. Armstrong demanded the May wages.  In a subsequent letter to the University on August 2, 2022, Mr. Armstrong reiterated his demand for May wages and for June 1 and 2, 2022 wages also.

72.     LSU has refused and/or failed to pay the outstanding wages that were due and owing to Mr. Armstrong on the termination date.

73.     Upon information and belief, LSU has no equitable defense or good faith excuse for its refusal or failure to do so.

## SPECIAL DAMAGES PLEADINGS

*As to the First Claim*

74.     Because LSU's termination decision was unsupported by any factual findings cognizable under the Contract but based rather on mere allegations the University itself publicly contested, it flouts the Contract's procedural requirement that any "judgment" as to a "for cause" termination "not be made arbitrarily or capriciously."  A termination for cause based on mere allegations is the very definition of arbitrary and capricious, particularly when the University itself refused publicly to accept the allegations as well-founded and where its actions surrounding the 2019 Wade contract renegotiations reflect its knowledge that it could not terminate its head coach based on unsubstantiated rumor absent his specific contractual agreement to the same.  Even after Mr. Armstrong pointedly challenged a termination "for cause" based on mere allegations as violative of the Contract, and offered to walk away if the University paid him through June 30, 2022 and reclassified the termination as "without cause," LSU remained stubbornly and capriciously wed to the "for cause" determination.   This was not an honest mistake on its part.  As such, Mr. Armstrong's waiver of consequential damages is not binding.

75.     LSU's termination of Mr. Armstrong without cause was in breach of the Contract. Its actions in terminating the Contract based on mere allegations that were not cognizable "for cause" grounds under the Contract renders it an "[o]bligor in bad faith" under Louisiana Civil Code Article 1997.   LSU demonstrated in the 2019 Wade contract renegotiations, as noted in former President Alexander's New York Times interview, its acknowledgement that a career cannot be destroyed on mere allegations.  Mr. Armstrong argued as much in challenging the Notice of Intent.  And yet that is precisely what LSU did with regard to Mr. Armstrong, even

while it disputed and ████████████ the veracity of the NCAA allegations, ████████

████████████████████████████████████

76.     Surrounding circumstances detailed above, including explicit credit the CCU gave the University in the NOA for its self-imposed penalties with regard to the football program, indicate that the University consciously terminated Mr. Armstrong for purported cause in breach of his contract – jettisoning both Wade and Mr. Armstrong promptly following issuance of the NOA would maximize its ability to secure a favorable pre-hearing resolution of the charges or at worst would offer mitigating circumstances lessening any penalty following a hearing. ████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████

77.     This reflected a cold and cynical calculus on the University's part that it was more crucial to defend itself from the failure "to exercise institutional control" charge and mitigate any penalty than to honor its contract with Mr. Armstrong and avoid any subsequent (and justifiable) contract breach claim from him.   The University was willing to make Mr. Armstrong, his reputation and due process rights sacrificial lambs for the sake of the football program's survival. As such, and pursuant to Article 1997, LSU is liable also on Mr. Armstrong's first claim "for all the damages, foreseeable or not, that are a direct consequence of [its] failure to perform."

*As to the Second Claim*

78.    The Contract obligated the University to pay Mr. Armstrong all compensation due to him under the Contract through the June 3, 2022 date of termination.   In letters from his lawyers to LSU dated June 2 and August 2, 2022, Mr. Armstrong demanded payment of that compensation, including his salary and automobile allowance for May 2022.   For all the reasons above, the University could not have concluded that withholding this compensation for May 2022 and the first two days of June was in good faith.   In particular, its position that the termination date was March 12, 2022 would nullify Mr. Armstrong's procedural due process rights under the Contract and is otherwise not a legitimate or fair reading of section 11 of the Contract.

79.    LSU's failure or refusal to pay Mr. Armstrong all compensation due and owing to him under the Contract renders it an "[o]bligor in bad faith" under Louisiana Civil Code Article 1997.   As such, and pursuant to Article 1997, LSU is liable also on Mr. Armstrong's second claim "for all the damages, foreseeable or not, that are a direct consequence of [its] failure to perform."

*As to the Third Claim*

80.    The Contract obligated the University to pay Mr. Armstrong all compensation due to him under the Contract through the June 3, 2022 date of termination.   In letters from his lawyers to LSU dated June 2 and August 2, 2022, Mr. Armstrong demanded payment of that compensation.   For all the reasons above, the University could not have concluded that withholding his salary for May 2022 and the first two days of June was in good faith.   In particular, its position that the termination date was March 12, 2022 would nullify Mr.

Armstrong's procedural due process rights under the Contract and is otherwise not a legitimate or fair reading of section 11 of the Contract.

81.    As such, Mr. Armstrong is entitled to penalty wages and reasonable attorney's fees under Title 23, section 632, of Louisiana law.

## PRAYER FOR RELIEF

82.    Mr. Armstrong seeks compensatory damages on his first claim in an amount to be determined at trial, including but not limited to, denied salary payments for May and June 2022; denied post-season incentive compensation given the Men's Basketball Team's qualification for the NCAA Division I National Tournament in 2022 and that, but for his wrongful termination, he would have actively coached the team in that tournament;  any other denied contractual benefits and/or perquisites for May and June 2022, *e.g.*, his monthly automobile allowance; loss of income and earning capacity;  diminished income and earning capacity;  loss of business opportunities; reputational damages sustained for the wrongful termination in bad faith, including humiliation, pain, suffering, and mental anguish; any penalty wages, reasonable attorney's fees or other sums due him under Title 23 of Louisiana Law, sections 631 and 632; any and all other damages, foreseeable or not, that are a direct consequence of the breach; interest running from the date of the breach; and such other and further relief as the Court may deem just and proper.

83.    Mr. Armstrong seeks compensation on his second claim for breach in the amount of his May 2022, June 1 and 2, 2022 salary payments and any other denied contractual benefits and/or perquisites for the month of May 2022, *e.g.*, his automobile allowance;  any penalty wages penalty, reasonable attorney's fees or other sums due him under Title 23 of Louisiana Law, sections 631 and 632;  any and all other damages, foreseeable or not, that are a direct

consequence of the breach;  interest running from the date of the breach;  and such other and

further relief as the Court may deem just and proper.

84.    Mr. Armstrong seeks compensation on his third claim for LSU's violation of the

LWPA in the amount of his unpaid wages for the month of May 2022 and June 1 and 2, 2022,

penalty wages and reasonable attorney's fees pursuant to La. Rev. Stat. §§ 23:631, 632.

Dated:  December   8  , 2022
           Baton Rouge, LA

                                        Respectfully submitted,


                                        TAYLOR WELLONS POLITZ & DUHE, LLC


                           By:    *s/Michael Mann Thompson*
                                   Michael Mann Thompson (#30758)
                                   4041 Essen Lane, Suite 500
                                   Baton Rouge, LA  70809
                                   Telephone:  (225) 387-9888
                                   Fax:  (225) 387-9886
                                   Email:  mthompson@twpdlaw.com

                                   *Counsel for Plaintiff William M. Armstrong*




OF COUNSEL:

Lisa A. Cahill
Lisa Cahill PLLC
747 Third Ave., 32nd Floor
New York, NY  10017